JAMES MORTENSON et al., Appellees, v. GILBERT KNUDSON, Administrator, Appellant.

LIMITATION OF ACTIONS: Tolling Statute—Oral Promise to Pay
1   Existing Matured Debt. An oral promise to pay, at a future date, an already matured claim, does not toll the statute of limitation.

EXECUTORS AND ADMINISTRATORS: Estate Debtor May Not
2   Transfer Title to Claim. The oral promise of one who is in-

debted to a decedent's estate that he will pay the claim to decedent's sole surviving heir, is ineffective to transfer title to such promisee,—title still remains in the estate.

**CONTRACTS:** Existing Matured Debt as Consideration. An exist-
3 ing, matured claim will not, of itself, furnish a consideration for an oral promise to pay such claim *at a future date.*

**LIMITATION OF ACTIONS:** New Promise to Avoid Bar on Old
4 Promise. An oral promise to pay, *at a future date*, an already matured claim, creates no *new* cause of action.

**DESCENT AND DISTRIBUTION:** Ownership of Claim—Evidence.
5 Evidence held insufficient to show that a claim did not pass to the surviving husband and heirs.

**TRIAL:** Instructions—Nonapplicability to Pleadings and Evidence.
6 Instructions are erroneous when wholly without support in the pleadings and evidence.

**WITNESSES:** Transactions with Deceased—Surviving Husband and
7 Heir. One who, as surviving husband and heir, is part owner of a claim against a deceased, is incompetent to testify to personal transactions and communications with the deceased, touching the validity of the claim.

**APPEAL AND ERROR:** Appeal by Administrator—Nonconsent of
8 Court. An administrator may, without obtaining the consent of the court, appeal from the allowance of a claim against the estate.


*Appeal from Hamilton District Court.*—R. M. WRIGHT, Judge.


MARCH 16, 1920.


REHEARING DENIED JULY 6, 1920.


CLAIM for $3,900 against the estate of the decedent, based upon an account for services rendered by the grandmother of the plaintiffs to the decedent for a period of 26 years. There was a trial to a jury, and a verdict for the plaintiffs for the full amount claimed. The defendant has appealed.—*Reversed and remanded.*

*O. J. Henderson,* for appellant.

*Wesley Martin* and *S. S. Smith,* for appellees.

EVANS, J.—I.  The account sued on began more than 40 years ago, and had fully accrued more than 14 years ago.  The more prominent questions involved in the case are:

(1)  The title of the plaintiffs to the alleged cause of action.

(2)  The avoidance of the statute of limitations.

(3)  The incompetency of the chief witness for the plaintiffs to testify, under the inhibition of Code Section 4604.

Briefly, the case set forth by plaintiffs is that Melinda Jacobson entered the service of the decedent, Nels Jacobson, in 1878, at $3.00 per week, and continued in such service until the day of her death, November 25, 1904; that she left surviving her an only child, Bertha Mortenson, the wife of Ole Mortenson, who is the chief witness for plaintiffs; that, in August, 1913, Bertha Mortenson died, leaving surviving her her husband and six sons; that, in the year 1917, one of these sons, Melinius, died unmarried, leaving his father surviving him as only heir; that the decedent, Nels Jacobson, died March 14, 1918; that the five plaintiffs are the only surviving sons of Bertha Mortenson. These five plaintiffs claim to take, not as heirs of their mother, but under and by virtue of an alleged contract with the decedent.  The question when and with whom such contract was made, is to be considered later.

1.  LIMITATION OF ACTIONS: tolling statute: oral promise to pay existing matured debt.

We have first to consider and to construe the petition of the plaintiffs.  It avers as follows:

"That, at the time of the death of the said Nels Jacobson, he was indebted to the plaintiffs in the sum of $3,900, and interest thereon at the rate of 6 per cent per annum since November 28, 1904, by virtue of the following facts, to wit:

"That, on and between June 1, 1878, and November 25, 1904, both dates inclusive, one Melinda Jacobson, the grandmother of the plaintiffs, performed labor and services as housekeeper for the decedent, at his request, of the reasonable and agreed value of $3,900.

"That, on November 25, 1904, the said Melinda Jacobson died intestate, in Hamilton County, Iowa, leaving her daughter, Bertha Mortenson, her sole heir at law.

"That, on said November 25, 1904, the decedent, in consideration of the debt then due from him to the estate of Melinda Jacobson, did promise to pay the said sum of $3,900, with legal interest, to the said Bertha Mortenson or her heirs and assigns, payable upon the death of decedent.

"That, on June 6, 1913, the said Bertha Mortenson died intestate, in Hamilton County, Iowa, leaving her heirs at law Ole M. Mortenson, her husband, and these plaintiffs.

"That, at various times subsequent to the death of Bertha Mortenson, the deceased, Nels Jacobson, recognized and affirmed the debt due from him to Melinda and Bertha, as aforesaid; and particularly, on or about October 24, 1917, the said Nels Jacobson, at Hamilton County, Iowa, in consideration of the debt due to Melinda and Bertha, as aforesaid, did promise and agree to pay to these plaintiffs the amount due Melinda at the time of her death, to wit, the sum of $3,900, with legal interest since November 25, 1904, the same to be payable upon the death of the said Nels Jacobson."

Later, an amendment to the petition was filed, as follows:

"That, on or about November 25, 1904, the decedent, in consideration of the services performed for him by Melinda Jacobson in her lifetime, did promise to pay to the children of Bertha Mortenson who should survive the decedent, the plaintiffs herein, in the event that the said Bertha Mortenson should predecease the said Nels Jacobson, the sum of $3,900, with legal interest, the same to be payable upon the death of the decedent."

Though this petition pleads alleged promises, made on different dates, it fails to state to whom such promises were made. Apparently for the purpose of correcting this defect, another amendment was filed, which averred that all the alleged promises were made to the "promisees in said claim named." No promisees are, in fact, named in said claim or petition, and this amendment adds nothing to the petition in its original form.

Construing the petition in the light of the evidence offered in support of its allegations, it appears from such evidence that the alleged promise of November 25, 1904, was made two days after the death of Melinda, and was made to Bertha and Ole Mortenson; and that the alleged promise of October 24, 1917, was made to Ole Mortenson, the father of these plaintiffs.

Analyzing the petition, it pleads the following successive contracts:

(1)   A contract with Melinda for her services at $3.00 per week.

(2)   A contract with Bertha, after the death of Melinda, whereby the decedent agreed to pay to Bertha and to her heirs and assigns, at the death of decedent, the amount due Melinda.

(3)   A contract with Bertha that the decedent would pay such debt to such of the children of Bertha as should survive the decedent.

(4)   The contract of October, 1917, with Ole Mortenson, that the decedent would pay such debt to the surviving children of Bertha.

The plaintiffs have rested their claim upon the third and fourth contracts above stated, and not upon the first or second.

The defendant pleaded a general denial and the statute of limitations and a defect of parties, in that Ole Mortenson was a necessary party, as the only heir of Melinius Mortenson, and as the surviving husband of Bertha.

The difficulties confronting the plaintiffs are that, if

they should rely upon the original contract with Melinda, which, under both their pleading and their evidence, was a simple contract for services at $3.00 per week, then the statute of limitations, unless avoided, would bar recovery. Furthermore, even if such bar could be avoided, Ole Mortenson would be a person in interest, both as surviving husband of Bertha and as the sole heir of Melinius, and would, therefore, be incompetent to testify to the many transactions to which he did testify. To eliminate such evidence would be to eliminate the case.

The theory put forward by the plaintiffs is that the original contract between Nels and Melinda furnished a consideration for the subsequent promises, and that these subsequent promises had the effect to toll the running of the statute of limitations.

Taking the testimony on behalf of plaintiffs, Melinda had been in the service of the decedent up to the time of her last illness. This last illness continued for many months, during which she was in charge of a nurse. It is manifest, therefore, that her cause of action, if any, had accrued either at the time of her death or some months prior thereto. Suppose it be true, therefore, that, after the death of Melinda, Nels promised Bertha that he would pay her the indebtedness at the time of his death. Would such promise toll the statute of limitations which was already running? If yea, then a promise that he would pay it within 10 years would be equally effective. We suspect that counsel would hardly contend for this latter hypothesis, as sufficient to toll the statute. But if not, why. not? What reason can be given for saying that an oral promise to pay an accrued debt at the time of promisor's death would toll the statute, and that a like promise to pay at the expiration of 10 years would not toll the same? The statute expressly provides the methods and conditions under which the running of the statute is tolled. Among others, a written promise or a written acknowledgment is provided. No authority is cited to us wherein it has ever been held that an oral promise to pay at a later date will

toll the running of the statute upon an account already accrued. Closely associated with the question of validity and effect of this promise is the question of alleged title of the plaintiffs to the cause of action which accrued to Melinda, and whether there was any consideration for the later promise upon which the plaintiffs rely. We turn to these questions.

II.   Suppose it be true that, after the death of Melinda, Nels orally promised Bertha to pay to her the amount due to Melinda. Or suppose that, after the death of Melinda, Nels promised to pay the amount due Melinda to the boys of Bertha. Would either of those promises carry to Bertha or to her boys the title or ownership of such claim? Was Nels any less indebted to the estate of Melinda after such promise than he was before? If the administrator of Melinda's estate ·had demanded from him the payment of such claim, could he have defended on the ground that he had promised to pay it to Bertha or to her boys at the time of his death? It is only fair to counsel for plaintiff to say that they do not claim that they thereby acquired title to Melinda's claim. Their real claim is that the subsequent promise of Nels to pay to Bertha and her boys was valid and binding, such promise being first made in 1904 and repeated in 1917. The query might well be raised here that, if such promise rendered Nels no less indebted to the estate of Melinda than he was before the promise, what consideration was there for the promise to Bertha and her boys?

2. EXECUTORS AND ADMINISTRATORS: estate debtor may not transfer title to claim.

If we look upon Bertha as the sole beneficiary of her mother's estate, and if we assume that there were no debts or expenses to absorb any part of such estate, then Bertha might, in an equitable sense at least, be deemed the owner of such claim which had accrued to her mother. Then, by the promise of Nels to pay her at a future time, she got nothing more than she had before. This only brings us back to

3. CONTRACTS: existing matured debt as consideration.

where we were. We have an oral promise to pay in the future a debt already due. The only consideration for the promise was the existing debt. It was not binding upon her. It could not have been pleaded as a defense against her, if she had brought a suit to recover through the medium of an administrator.

If such subsequent promise could not have been pleaded as a good defense against her, neither is it available as a cause of action in her favor or in favor of her boys.

It is clear, therefore, that the only valid agreement or promise disclosed in the petition is that between the decedent and Melinda, and that whatever title to such cause

4. LIMITATION OF ACTIONS: new promise to avoid bar on old promise.

of action is held by the plaintiffs is so held by them as the heirs of their mother, Bertha, who took the same as sole heir of her mother, Melinda. The alleged subsequent promises may have been properly shown as proof of the existence of the original cause of action, but they added nothing to the cause of action itself, and took nothing away therefrom. What the cause of action was in the life of Melinda, it still is, unless barred by the statute.

Even if the new promise made by Nels had been in writing, duly signed, it would not constitute a new cause of action. It would be effective, under the statute, only to revive the original cause of action, or to extend its life by tolling the statute of limitations and starting it anew. This is the settled law in this state. *Frisbee v. Seaman,* 49 Iowa 95; *Bayliss v. Street,* 51 Iowa 627.

In *Price v. Price,* 34 Iowa 404, a subsequent oral promise by the debtor was relied on, which deferred the maturity of the debt to a future time, when the creditor "should get married." That is to say, the debtor made a subsequent promise to pay the debt when the creditor "should get married," and the creditor assented thereto. It was held that such alleged new contract was ineffective, and not binding upon either party, in that it lacked consideration, either of benefit to the one or prejudice to the other. To put it in another way, such an agreement does not

amount to a binding contract, because it lacks subject-matter.

Applying the holding in the *Price* case to the alleged agreement first made with Bertha on November 25 (or 27), 1904, whereby Nels agreed to pay the amount due the estate of Melinda at the time of his own death, nothing was gained or lost by either party. Without such promise, the estate of Nels would be liable for the debt, if such, unless it were sooner extinguished, either by payment or by the statute of limitations. With such promise, such liability was neither greater nor less.

The alleged promise of October 24, 1917, was made 4 years after the death of Bertha. But the statute had fully run before the death of Bertha. Such oral promise was not sufficient to revive the original cause of action, as held in the *Price* case, supra; nor was it sufficient to constitute a new cause of action, as held in the *Frisbee* and *Bayliss* cases, supra.

III. We do not overlook the emphasis laid in the pleading and in the argument of plaintiffs upon the provision in the alleged promise of Nels to Bertha which attached the condition that she should survive him, and provided, as it were, a sort of contingent remainder in her sons who should survive him. Assuming that it were competent in such manner to qualify and distribute the title to the original cause of action, we do not find support in the evidence for this particular feature of the alleged promise. The case for plaintiffs rests wholly upon the testimony of Morten Mortenson, one of the plaintiffs, and Ole Mortenson, the father of the plaintiffs.

5. DESCENT AND DISTRIBUTION: ownership of claim: evidence.

In proof of the original contract between Nels and Melinda, Ole Mortenson testified to a conversation held in 1890 or 1891, on the "east side of Nel's house," as follows:

"A. Melinda and I were talking of the way she came to work for Uncle Nels. Uncle Nels came from the house and stopped, and she repeated the conversation. She said, when Uncle Nels bought the farm, he sent for her to come

as a housekeeper, and that he would pay her the same as she had worked at. Uncle Nels said, 'That is right.' She said she had $3.00 a week, and when she came there, Uncle Nels offered her the same, and that is the way she came to work for Uncle Nels; and Nels said, 'That is right.' "

He testified also to a conversation with Nels, "two days after she [Melinda] died," as follows:

"A. Nels says: 'I will take care of Melinda as a sister. I will give her a funeral. She has been working for me 26 years, and I have paid her nothing. What I owe Melinda shall go to Bertha and her boys.' "

He also testified to a conversation overheard by him between Bertha and Nels, as follows:

"A. Bertha asked Uncle Nels how much he owed her mother. Nels said, 'I owe her $3.00 a week, with interest.' He said in Norwegian, 'Interest and interest interest.' Bertha said she would not be hard on him, and said, 'You can give me a paper.' Nels says, 'No, you—if you live—or your boys shall have it after I die. It can be paid when I die.' "

He testified also to a conversation between him and Nels, had on the evening of the day before Bertha died, as follows:

"He said, 'I would have settled with Bertha, but I didn't, and I am going to settle with the boys.' He says, 'If you will take care of what you have got, you have got enough. I don't want you to have anything, but what little there is, is going to go to her boys.' He said that more than once, that I shouldn't have a cent of his estate."

At this time, the six sons of Bertha were living. The next alleged conversation testified to by him was had in October, 1917, as follows:

"A. He said: 'If anything should happen me between now and then, I will either write you or wire you. I have found out that the court will allow these boys all earnings of my sister that worked for me.' He said, 'Figure her wages $3.00 a week, with interest and interest interest, and be sure that you get it figured or figure it.' He said, 'You

can get somebody that knows how to figure it.' He told me to take the first year with my given amount, and there will be no interest on it, but you put that out at interest the next year, and you add a little interest to it, 6 per cent, or whatever it may be, and from then on until the time it expires."

He testified also to the next conversation as having been had with Nels on the day of his death, as follows:

"A. He said that I should close the door; he wanted to talk to me alone. He told me that I should go get the key for a little chest he had that he had money in and some papers, a bank certificate, but how much he didn't say, but he said he had $265 in money. He says, 'You go and get the key and open that chest, and take that money for your expense coming down to see me.' He said: 'I have been worried all night that I have even dreamed about it; and I am sorry that I didn't get this fixed up between me and the boys before now. I dreamed about it that the Jacobsons will tear everything to pieces for the boys.' "

Morten Mortenson, one of the plaintiffs, testified to a conversation between Nels and Bertha in 1904, as follows:

"I remember the conversation between my mother and Nels. I did not take part in the conversation. It was in the kitchen. He was washing the cream cans. He said, 'Melinda is dead, and I paid her nothing for this; but if you live over me, you shall have what is left, and if you don't, and I live over you,' he says, 'I will make it to your boys, and have what is hers.' "

The witness was 8 years of age at the time of such conversation. This witness testified also to a conversation had in January, 1918, between Nels and one Carl, his hired man, as follows:

"A. Carl asked Nels what he would do with the property. He said, 'I ain't got nothing made up. And when you are dead,' he said, 'it will be all torn up.' Nels said he knows where it is going. He says: 'It will all be taken care of. You don't need to worry about that. The agreement between Melinda and I was that, if she lived over I,

she should get it, and if she died and Bertha lived over us, she should get it. Now both of them are dead,' he says, 'and I am left, and the agreement was that Bertha's children should have what is left for her work.' And he paid her nothing for the time she had been there, and she should have $3.00 a week, with interest, for 26 years. That was between 10 and 11 o'clock at night. * * * 'Now,' he [Carl] said, 'you ain't got no papers made, and it will be all torn up.' 'Don't worry,' he said, 'about that.' He said, 'That is all fixed.' He said: 'The agreement between Melinda and I that, if Melinda lives over me, she is to have it, and if Bertha lives over me, she is to have it; and now they are both gone, and the agreement was between Melinda and I to pay Bertha's children.' "

It will be seen from the foregoing testimony that it disclosed no diminution or qualification of the title of Melinda as sole payee of the debt due her for her services; nor of the later title of Bertha as sole heir of Melinda; nor of the title of Bertha's boys as her only heirs, and of her surviving husband as such. It is clear, therefore, that, if this claim had escaped the bar of limitations, the title thereto would have passed, subject to administration, to the surviving husband and heirs of Bertha.

Some references contained in the foregoing testimony find their explanation in other conceded facts. Nels was an unmarried man. He died intestate, leaving property consisting, in the main, of a farm of 80 acres. His only heirs were the children of his only brother, and these grand-children of his only sister Melinda. In other words, "Bertha's boys" would take, under the law, one half of the estate. In so far, therefore, as the petition purports to show a deflection of the title of this claim from the legal line of inheritance, it is not sustained by the evidence.

IV. The case was submitted to the jury under instructions that were very general in form. Apart from formal matters and the statement of issues, the whole case was gathered into the second paragraph of Instruction

6. TRIAL: instructions: nonapplicability to pleadings and evidence.

III, on burden of proof, as follows:

"(2)   That Nels Jacobson agreed and promised that he would cause compensation to be paid, for such work and labor, to Melinda Jacobson personally, in the event that he should die before she did; but, in the event that he should survive the said Melinda Jacobson, but should die before the death of Bertha Mortenson, then, in such event, on his death, he would cause said compensation to be made personally to Bertha Mortenson; but, in the event that he should survive both Melinda Jacobson and Bertha Mortenson, then, in such event, compensation, on his death, for said services for said work and labor, should be paid to the children of the said Bertha Mortenson."

No question pertaining to the operation of the statute of limitations was submitted to the jury.

It will be noted from an analysis of this instruction that it was predicated upon the hypothesis that the original agreement between Nels and Melinda not only deferred payment of the claim until the death of Nels, but that it qualified the title of Melinda, so that she could not have controlled the disposition of the claim by will or otherwise. The twofold objection to this hypothesis is:

(1)   That it has no support in the petition.

(2)   That it has none in the evidence.

The submission of the case on this hypothesis doubtless explains why the question of the statute of limitations was not submitted to the jury.

The foregoing is, perhaps, a sufficient discussion of the questions presented by pleading and evidence to indicate the reasons for the conclusions which we reach. By way of recapitulation, these conclusions may be specified as follows:

(1)   The title of Melinda Jacobson to the original claim now sued on was unqualified and unconditional, and was fully accrued and payable at the time of her death.

(2)   That Bertha succeeded to such title, subject to the rights of administration.

(3)    That Ole Mortenson, as surviving husband, and her six sons, as her only heirs, succeeded, subject to administration, to whatever right or title subsisted to Bertha at the time of her death.

(4)    That the statute of limitations had fully run against such claim, long before the death of Bertha.

(5)    That the alleged promises subsequent to the death of Melinda to make payment at a deferred time were wholly ineffective, either to toll the statute of limitations or to constitute new causes of action.

(6)    That, if avoidance of the statute of limitations were disclosed, Ole Mortenson, as a witness, must be deemed to come within the inhibition of Section 4604.

7. WITNESSES: transactions with deceased: surviving husband and heir.

(7)    The defendant's objections and his motion to strike should have been sustained, as to much of the evidence of Ole Mortenson.

(8)    The defendant's motion for a directed verdict should have been sustained.

V.    The appellee has presented a motion to dismiss the appeal, on the general ground that this litigation is over a claim in probate, and that the administrator had no power to ignore the finding of the trial court, or to appeal therefrom without permission of such court. If it be necessary for an administrator, in such case, to obtain the permission of the trial court, in order to prosecute his appeal here, such condition has been met by the granting of such permission by the trial court. We know of no reason, however, why such permission should· be essential to the appellate jurisdiction of this court. Where litigation against an estate is contested in good faith by the administrator, the trial court sustains no closer relation to the administrator than he does to the claimant. In such a contest, the rights of the administrator are disposed of by the ruling and judgment of the court, precisely as the rights of any other litigant. If his rights are identical

8. APPEAL AND ERROR: appeal by administrator: nonconsent of court.

with those of other litigants in the trial court, we can see no reason for finding that they are any different in this court. The motion to dismiss is, therefore, not well taken. The judgment below must, therefore, be—*Reversed and remanded.*

WEAVER, C. J., PRESTON and SALINGER, JJ., concur.